IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CV-945-D

TAMMY HORTON, )
)
Plaintiff, )
)
v. ) **ORDER**
)
THE METHODIST UNIVERSITY, INC., )
)
Defendant. )

On December 15, 2016, Tammy Horton ("Horton" or "plaintiff") filed a complaint against The Methodist University, Inc. ("Methodist" or "defendant"), alleging violations of section 504 of the Rehabilitation Act of 1973 ("the Rehabilitation Act") and the Americans with Disabilities Act ("ADA") [D.E. 1]. On April 30, 2018, Methodist moved for summary judgment [D.E. 34], filed a memorandum in support [D.E. 35], and filed a statement of material facts [D.E. 36]. Methodist also filed various motions [D.E. 46, 47, 59, 75]. On July 3, 2018, Horton responded in opposition to Methodist's motion for summary judgment [D.E. 52–55]. On August 14, 2018, Methodist replied [D.E. 57]. As explained below, the court grants Methodist's motions for summary judgment, to seal, for leave to file, and to strike.

I.

From 2010 until December 2012, Horton attended Methodist as an undergraduate student. See [D.E. 36] ¶ 1.[1] In 2012, Horton graduated with a Bachelor of Science degree in biology. See

---

[1] Under Local Civil Rule 56.1, a party opposing a motion for summary judgment shall submit "a separate statement including a response to each numbered paragraph in the moving party's statement [of material facts]." Local Civ. R. 56.1(a)(2). "Each numbered paragraph in the moving party's statement of material facts will be deemed admitted for purposes of the motion unless it is

id. ¶ 2. While an undergraduate, Horton applied for and received academic testing accommodations because of her "anxiety in close quarters [and] test anxiety." Id. ¶¶ 6–7 (quotation omitted). Horton worked with Linda Szulc ("Szulc"), Methodist's Director of Accessibility Resources/Disability Services, to receive testing accommodations. See id. ¶ 6. The accommodations included "double time for exams in a reduced distraction environment." Id. ¶¶ 6, 8 (quotation omitted). Horton received accommodations for all of her science classes. See id. ¶ 8.

Soon after Horton graduated from Methodist, Horton's husband, Eric Horton, medically retired from the United States Army. See id. ¶ 23. On July 25, 2013, Horton applied to serve as her husband's primary family caregiver. See id. ¶ 24. On January 14, 2014, after completing the VA National Veteran Caregiver Training Program, Horton was designated as her husband's primary family caregiver. See id. ¶¶ 25–26. As part of Horton's role as a primary family caregiver, Horton received an hourly wage of $11.10 (40 hours per week and 174 hours per month, totaling $1,931.40 per month). See id. ¶¶ 27–29.

On January 29, 2014, Horton applied for Methodist's Physician Assistant program ("MUPA

---

specifically controverted by a correspondingly numbered paragraph in the opposing statement." Id. "Each statement by the movant or opponent . . . must be followed by citation to evidence that would be admissible, as required by Federal Rule of Civil Procedure 56(c)." Local Civ. R. 56.1(a)(4). Under Rule 56(c), a party disputing a material fact must support its position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Merely responding that a party "disputes" a material fact is insufficient under Rule 56 and Local Rule 56.1. See Howard v. Coll. of the Albermarle, 262 F. Supp. 3d 322, 329 n.1 (E.D.N.C. 2017), aff'd, 697 F. App'x 257 (per curiam) (unpublished).

Horton's reply to Methodist's statement of material facts [D.E. 55] violates Local Rule 56.1. See [D.E. 58] (summarizing Horton's violations). To the extent that Horton does not oppose any statement of material fact by citing to particular parts of the record or showing that Methodist cannot support its position based on evidence in the record, the court deems the material fact admitted. See Howard, 262 F. Supp. 3d at 329 n.1.

program"). See id. ¶ 19. Methodist admitted Horton to the MUPA program, and Horton began classes in September 2014. See id. ¶ 22. Horton also continued to serve as her husband's caregiver. See id. ¶ 33. The MUPA program is "a rigorous graduate professional and academic program" that consists of one year of academic courses and one year of clinical rotations. Id. ¶¶ 47–48. The first year consists of 38 courses, and students are assessed through formal written testing. See id. ¶¶ 47, 52. The MUPA program "prohibits students from being employed while attending the program, which is common at most Physician Assistant programs." Id. ¶ 57. Additionally, Methodist students are responsible for requesting academic accommodations. See id. ¶ 59. Students must finish with a 3.0 grade point average ("GPA") in order to graduate from the MUPA program. See id. ¶ 62. The lowest passing score a student can receive is a C. See id. ¶ 63. If a student fails any course, the student must remediate the course or else the student is automatically dismissed from the program. See id. ¶ 64. A student may remediate only two courses. See id. ¶ 66. If a student fails a third class, the student is automatically dismissed from the program. See id. Students may apply for and receive academic accommodations, but students need not use approved academic accommodations. See id. ¶¶ 67, 73. Upon enrolling, Horton received a copy of the MUPA program's policies, and she signed a form acknowledging that she received the program's policies. See id. ¶¶ 79, 85.

During the Fall 2014 semester, one of Horton's professors, Dr. Matthew Kesic ("Kesic"), described Horton as "an average student." Id. ¶ 91. Horton told Kesic that she had test anxiety, and Kesic recommended that Horton consult with Szulc, Dr. Deborah Morris ("Morris"), the Academic Coordinator of the MUPA program, and Horton's academic advisor concerning her test anxiety. See id. ¶ 92. Horton did not, however, consult with these three individuals during the Fall 2014 semester, and Horton never informed Kesic that she had received academic accommodations while she was an undergraduate at Methodist. See id. ¶¶ 93–94. In fact, Horton never requested academic

3

accommodations during the Fall 2014 semester. See id. ¶ 95. Among the nine courses that Horton took during Fall 2014, Horton received a C+ in Physiology, a C in Gross Human Anatomy, and failed Pharmacology I. See id. ¶¶ 90, 96; [D.E. 42-12] 1. Morris notified Horton that she had failed Pharmacology I and began working with Horton to develop a plan to remediate the course. See [D.E. 36] ¶ 99; [D.E. 39-4]. After Morris sent Horton a message concerning topics to focus on for improvement in Pharmacology I, Horton replied:

> Don't be surprised if you have a difficult time trying to determine the areas where I was weak because my poor performance was due to a general lack of knowledge regarding the chapters. I didn't have difficulty with the material itself. I just did not study it.

[D.E. 39-4]; see [D.E. 36] ¶ 100. Horton successfully remediated Pharmacology I, although Horton still did not request or mention academic accommodations. See [D.E. 36] ¶ 101. At the end of the semester, Horton had a 2.914 GPA. See id. ¶ 103; [D.E. 42-12] 1.

At the beginning of the Spring 2015 semester, Horton met with Dr. Lori Brookman Cornwell ("Cornwell"), the Dean of the School of Health Sciences at Methodist from 2012 until July 2015. See [D.E. 36] ¶¶ 44, 105. During the meeting, Horton notified Cornwell that Horton suspected Horton's peers in the MUPA program may be cheating. See id. ¶ 105. Following the meeting, Horton e-mailed Cornwell and said that she was "very grateful to know that [she could] come to [Cornwell] and share [her] concerns." Id. ¶ 106; [D.E. 40-9]. Nevertheless, Horton never raised any concerns about academic accommodations with Cornwell. See [D.E. 36] ¶ 108.

During the Spring 2015 semester, Methodist faculty identified Horton as a "struggling student." Id. ¶ 109. Horton met with various faculty members, including Morris and Christina Beard ("Beard"), the Program Director for the MUPA program, several times during the Spring 2015 semester to address Horton's poor academic performance. See id. ¶¶ 111–12, 116–19. For example,

4

on March 12, 2015, Beard met with Horton to discuss a Gastroenterology exam (on which students in the MUPA program rarely struggled) that Horton had failed. See id. ¶ 112. Beard concluded from the meeting that Horton's "primary problem was a lack of comprehension of foundational concepts more so than difficulty with test taking skills as [Horton] seemed to believe." Id. ¶ 114; [D.E. 38-1] ¶ 50. Beard also noted Horton's "struggles across the curriculum." [D.E. 36] ¶ 115; [D.E. 38-1] ¶ 51. Both Beard and Morris recommended that Horton seek academic accommodations. See [D.E. 42-5].

On March 25, 2015, Horton e-mailed Szulc and expressed a desire to have academic accommodations, but did not request any specific accommodation. See id.; [D.E. 36] ¶ 124. Szulc said that she would contact Morris concerning Horton's undergraduate accommodations. See [D.E. 42-5]. On March 30, 2015, Szulc e-mailed Morris and explained that Horton had qualified for academic accommodations as an undergraduate at Methodist. See [D.E. 39-6]; [D.E. 36] ¶¶ 126–27. Szulc also described the nature of these accommodations to Morris. See [D.E. 36] ¶ 126. Morris and Beard agreed that Horton should receive "150% of the standard time on exams," instead of the double time that Horton had received as an undergraduate. See [D.E. 36] ¶¶ 128–31. Methodist made no accommodations concerning Horton's physical testing environment. Cf. [D.E. 36] ¶ 135.

Methodist scheduled final exams for Spring 2015 between April 7, 2015, and April 17, 2015. See id. ¶ 141. On April 1, 2015, Horton's brother unexpectedly died, and Horton "took time off from school as a result." Id. ¶ 140. As a result, Morris rescheduled some of Horton's final exams. Horton took her exams either in a vacant office or in the scheduled testing room. See id. ¶ 142. Horton never objected to her testing environment or the length of time that she received to complete her exams. See id. ¶¶ 145–46. Of the eleven exams that Horton took in Spring 2015, Horton failed five. See id. ¶ 147. Horton ultimately failed Pharmacology II, and Horton was required to remediate

5

the course. See id. ¶ 149. On April 17, 2015, Morris and Beard recommended that Horton withdraw from the program because, if she failed one more course, she would be automatically dismissed from the program. See id. ¶¶ 154–60. Morris and Beard guaranteed Horton that, if she withdrew, she would be re-admitted to the program the following year. See id. ¶ 161. On April 20, 2015, Horton declined to withdraw from the MUPA program. See id. ¶ 165. Horton's GPA at the end of Spring 2015 was 2.763. See id. ¶ 170; [D.E. 42-12] 1.

Horton continued to struggle academically during the Summer 2015 semester. See [D.E. 36] ¶¶ 172–78. On July 30, 2015, Horton acknowledged that "she needed to put forth more effort." Id. ¶ 181. Of the twelve courses that Horton took during Summer 2015, Horton received a C+ or lower in five of them. See id. ¶ 178. Horton's GPA after Summer 2015 was 2.803, which was last in her class. See id. ¶ 188; [D.E. 42-12] 2. Horton still did not raise concerns about her accommodations, and Horton still did not seek assistance from her professors during the semester. See [D.E. 36] ¶¶ 184, 189.

At the start of the Fall 2015 semester, Horton met with Dr. Todd Telemeco ("Telemeco"), who replaced Cornwell as the Interim Dean of the School of Health Sciences, to discuss "issues with academics, her fellow students, and the [program's] faculty." Id. ¶ 190. In part, Horton discussed her grade in Pharmacology III, a course that she took in Summer 2015. See id. ¶ 191. Horton appealed her grade in Pharmacology III, and Methodist raised her grade to a B-. See id. ¶¶ 198–99.

Later in the semester, Horton met with Kesic because Horton "was having problems with Orthopedics and . . . the final exam worried her." Id. ¶ 206; see [D.E. 40-10] ¶¶ 22–23. Horton took the Orthopedics final exam in the regular testing room. See id. ¶¶ 210, 213. Horton did not request additional time and, in fact, turned the exam in five to ten minutes early. See id. ¶¶ 212, 218–20, 223. Horton scored a 62% on the exam, resulting in a 69% overall in the course. See id. ¶ 221, 228.

Horton's cumulative GPA after the semester was a 2.8590. See id. ¶¶ 229–30; [D.E. 42-12] 3.

Because Horton failed her third course, Methodist dismissed her from the MUPA program in October 2015. See [D.E. 36] ¶ 231. On October 14, 2015, Horton met with Beard and Telemeco to discuss her dismissal. See id. ¶ 232. During the meeting, Horton did not raise any concerns about her academic accommodations. See id. Horton sent a series of e-mails to Beard after the meeting, but Horton still did not question her accommodations. See id. ¶ 235; [D.E. 38-4]. On October 16, 2015, Horton also e-mailed her Orthopedics professor, Dr. Susan Greer Fisher ("Fisher"), and attempted to explain why Horton believed her incorrect answers to be correct. See [D.E. 36] ¶¶ 237–41; [D.E. 40-2]; cf. [D.E. 40-3]. In the e-mail, Horton did not question her accommodations. See [D.E. 36] ¶ 239.

On October 19, 2015, Horton appealed her Orthopedics grade and her dismissal from the program. See [D.E. 36] ¶¶ 254, 258–60; [D.E. 44-2].[2] In her appeal, Horton raised issues concerning her academic accommodations. See [D.E. 36] ¶ 263. As for Horton's grade appeal, Fisher added points to Horton's Orthopedics final exam and homework, which increased her final grade to 70%. See id. ¶ 265–66. Even with the adjustment, Horton still received a failing grade. See id. ¶ 266. Telemeco reviewed the decision and concluded that Horton had received appropriate accommodations and affirmed that Horton had failed Orthopedics. See id. ¶¶ 275–84. On November 6, 2015, Horton withdrew her appeals. See id. ¶ 289; [D.E. 42-11].

II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment

---

[2] On the same date, Horton also filed a disability grievance with the United States Department of Education Office for Civil Rights. See [D.E. 36] ¶ 256; [D.E. 44-10]. On December 9, 2015, the Office for Civil Rights dismissed Horton's grievance. See [D.E. 36] ¶ 257.

7

as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of plaintiff's position [is] insufficient . . . ." Id. at 252.; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

A.

Horton alleges that Methodist discriminated against her in violation of section 504 of the Rehabilitation Act. See Compl. [D.E. 1] ¶¶ 69–79. The Rehabilitation Act "precludes federal grantees from excluding, denying benefits to, or discriminating against any otherwise qualified individual solely by reason of her or his disability." Halpern v. Wake Forest Univ. Health Scis., 669

8

F.3d 454, 461 (4th Cir. 2012) (quotation and alteration omitted); see 29 U.S.C. § 794(a). "In the context of a student excluded from an educational program, to prove a violation of [the Rehabilitation Act], the plaintiff must establish that (1) [she] has a disability, (2) [she] is otherwise qualified to participate in the defendant's program, and (3) [she] was excluded from the program on the basis of [her] disability." Halpern, 669 F.3d at 461 (footnote omitted); see Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005); Baird ex rel. Baird v. Rose, 192 F.3d 462, 467 (4th Cir. 1999); Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1264–65 (4th Cir. 1995). The Rehabilitation Act requires a plaintiff to demonstrate that she was "excluded solely by reason of [her] disability." Halpern, 669 F.3d at 462 (quotation omitted); see 29 U.S.C. § 794(a); Baird, 192 F.3d at 469.

The court assumes without deciding that Horton has a disability for the purposes of the Rehabilitation Act. Even assuming that Horton has a disability, no rational jury could find that Horton is otherwise qualified to participate in the MUPA program. A "qualified" individual is one "who, with or without reasonable modifications to rules, policies, or practices, meets the essential eligibility requirements for participation in a program or activity." Halpern, 669 F.3d at 462 (quotation and alteration omitted); see Class v. Towson Univ., 806 F.3d 236, 245–46 (4th Cir. 2015); Constantine, 411 F.3d at 498. To show that she was qualified for the MUPA program, Horton must show that (1) she could satisfy the essential eligibility requirements of the program, and (2) if she cannot, whether "any reasonable accommodation by the defendant would enable [her] to meet" the program requirements. Halpern, 669 F.3d at 462 (alteration and quotation omitted); see Neal v. Univ. of N.C., No. 5:17-CV-186-BR, 2018 WL 2027730, at *4 (E.D.N.C. May 1, 2018) (unpublished).

Courts generally afford a degree of deference to "schools' professional judgments regarding

students' qualifications when addressing disability discrimination claims." Halpern, 669 F.3d at 463 (collecting cases); Neal, 2018 WL 2027730, at *4. Viewing the evidence in the light most favorable to Horton, no rational jury could find that Horton was otherwise qualified to participate in the MUPA program. Notably, after her first year, Horton's GPA would not have been high enough for her to graduate from the MUPA program unless she performed significantly better in her second year. See [D.E. 36] ¶ 170; [D.E. 42-12]. Horton also failed three courses, and she acknowledged that she did not study enough for at least one of them. See [D.E. 39-4]; [D.E. 36] ¶ 100. Moreover, Horton was employed as her husband's primary caregiver throughout her time at Methodist, a violation of the MUPA program's requirement that students not be employed while in the program. See [D.E. 36] ¶ 33. Affording deference to the MUPA program as a post-secondary medical program and viewing the evidence in the light most favorable to Horton, Horton was not otherwise qualified for the MUPA program.

Alternatively, even if Horton could establish that she was otherwise qualified for the MUPA program with or without academic accommodations, no rational jury could find that Methodist excluded Horton from the MUPA program solely based on her disability. See Halpern, 669 F.3d at 466–67; Neal, 2018 WL 2027730, at *5–6. Methodist had a legitimate reason for dismissing Horton: poor academic performance. Horton struggled in her courses even when she received academic accommodations, and Horton failed three courses. Accordingly, the court grants Methodist's motion for summary judgment concerning Horton's Rehabilitation Act claim.

B.

In her second claim, Horton alleges that Methodist discriminated against her based on her disability in violation of Title III of the ADA. See Compl. [D.E. 1] ¶¶ 80–89. Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and

10

equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases . . ., or operates a place of public accommodation." 42 U.S.C. § 12182(a); see Halpern, 669 F.3d at 461. Discrimination includes "a failure to make reasonable modifications in policies, practices, or procedures," unless "such modifications would fundamentally alter the nature of [the program]." 42 U.S.C. § 12182(b)(2)(A)(ii). The ADA requirements are nearly identical to the Rehabilitation Act's requirements. See Halpern, 669 F.3d at 461; Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 214 (4th Cir. 2002); Doe, 50 F.3d at 1264 n.9; Neal, 2018 WL 2027730, at *3. The ADA, however, has a different causation requirement than the Rehabilitation Act. An ADA plaintiff need establish only that her disability was "a motivating cause of the exclusion," and not the sole motivation. Halpern, 669 F.3d at 462 (quotation omitted); see Baird, 192 F.3d at 468–70.

Viewing the evidence in the light most favorable to Horton, no rational jury could find that Horton was otherwise qualified for the MUPA program. Horton frequently either did not request or did not use academic accommodations during exams in her first year. Even with academic accommodations, Horton performed poorly in her first-year courses. For example, Horton failed three courses during her first year. Moreover, Horton's cumulative GPA was too low for Horton to graduate. Thus, she would have needed to improve her academic performance substantially during her second year. Even viewing the evidence in the light most favorable to Horton, no rational jury could find that Horton's disability was a motivating cause of her dismissal. See Halpern, 669 F.3d at 466–67; Neal, 2018 WL 2027730, at *5–6. Accordingly, the court grants Methodist's motion for summary judgment concerning Horton's ADA claim.

III.

Methodist moved to strike Horton's first and second affidavits, Scott MacKenzie's affidavit,

11

and a letter from Tiffany Puckett. See [D.E. 59]; [D.E. 75]. Horton's first affidavit, which she submitted to support her response to Methodist's motion for summary judgment, [D.E. 53-11], does not comport with Rule 56. See Fed. R. Civ. P. 56(c)(4); Antonio v. Barnes, 464 F.2d 584, 585 (4th Cir. 1972) (per curiam); King v. N.C. Dep't of Pub. Safety, No. 5:12–CV–152–F, 2014 WL 69601, at *2–3 (E.D.N.C. Jan. 8, 2014) (unpublished). Thus, the court grants Methodist's motion to exclude all portions of the affidavit that do not comply with Rule 56. As for Horton's second affidavit, [D.E. 67-1], Horton cannot submit a supplemental affidavit that contradicts her deposition testimony to avoid summary judgment. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999); In re Family Dollar FLSA Litig., 637 F.3d 508, 512 (4th Cir. 2011); Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975 (4th Cir. 1990); Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984). Thus, the court grants Methodist's motion to strike Horton's second affidavit.

As for Scott MacKenzie's affidavit [D.E. 53-15], Horton did not disclose MacKenzie as an expert as required by the court's scheduling order and the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 26(a)(2). The affidavit also violates the Federal Rules of Evidence. See Fed. Fed. R. Evid. 702. Accordingly, the court grants Methodist's motion to exclude MacKenzie's affidavit. See Fed. R. Civ. P. 37(c)(1); McCall ex rel. Estate of McCall v. Morant, 710 F. App'x 594, 595 (4th Cir. 2018) (per curiam) (unpublished), cert. denied, 139 S. Ct. 78 (2018); S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003); Gallagher v. S. Source Packaging, LLC, 568 F. Supp. 2d 624, 632 (E.D.N.C. 2008).

As for Tiffany Puckett's letter [D.E. 53-12], Horton first disclosed the letter in her response to Methodist's motion for summary judgment. Puckett drafted the letter on May 23, 2018, nearly two months after discovery closed. See [D.E. 53-12]. Horton never disclosed Puckett's identity during discovery. Accordingly, the court grants Methodist's motion to exclude Puckett's letter.

IV.

In sum, the court GRANTS defendant's motion for summary judgment [D.E. 34], GRANTS defendant's motion to seal [D.E. 46], and GRANTS defendant's motion for leave to file [D.E. 47]. Additionally, the court GRANTS IN PART defendant's first motion to strike [D.E. 59] and GRANTS defendant's second motion to strike [D.E. 75]. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This **23** day of January 2019.

*J. Dever*
JAMES C. DEVER III
United States District Judge